**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ST. JOHNS RIVERKEEPER, et al.,

      Plaintiffs,

vs.                                      Case. No. 3:04-cv-699-J-99-MCR

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, et al.,

      Defendants.

## **ORDER**

Plaintiffs St. Johns Riverkeeper ("Riverkeeper") and Linda Young ("Young") have filed this case under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 et seq., seeking judicial review of a final determination of defendant United States Environmental Protection Agency ("EPA")[1] in its implementation of the federal Water Pollution Prevention and Control Act, 33 U.S.C. §§ 1251, et seq., better known as the "Clean Water Act" ("CWA").  Before the Court is EPA's motion for voluntary remand to EPA for reconsideration of its final determination and supplementation of the administrative record.  Plaintiffs oppose the motion.

---

[1] In addition to EPA, plaintiffs have named as defendants EPA Region 4, the EPA Administrator, and the EPA Region 4 Administrator.  The Court refers to defendants collectively as "EPA."

**I.     Background**

Congress enacted the CWA in 1948 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this purpose, the CWA requires each state to establish its own water quality standards ("WQSs") subject to EPA review and approval. 33 U.S.C. § 1313(a). WQSs "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." 33 U.S.C. § 1313(c)(2)(A).

Florida has established EPA-approved WQSs for five classes of navigable waters within its boundaries, arranged in order from waters needing the most protection to those needing the least: Class I (Potable Water Supplies), Class II (Shellfish Propagation or Harvesting), Class III (Recreation, Propagation, and Maintenance of a Healthy, Well-Balanced Population of Fish and Wildlife), Class IV (Agricultural Water Supplies), and Class V (Navigation, Utility, and Industrial Use). Fla. Admin. Code Ann. r. 62-302.400. The lower portion of the St. Johns River at issue in this case is a predominately marine water with a Class III designation.[2] (Doc. 26 p. 290.)

---

[2]     The St. Johns River is divided into three ecological zones based on salinity: (1) a large freshwater tidal lake-like zone; (2) an intermediate brackish lake-like zone; and (3) a small, narrow marine zone near the mouth at the Atlantic Ocean. (Doc. 33-2 ¶ 22.)

The criteria for Florida's WQSs are in either narrative (i.e. statements representing a quality of water) or quantitative (i.e. specified levels) form. Fla. Admin. Code Ann. r. 62-302.200(29). The lower St. Johns River is subject to the narrative criterion that nutrient levels be set at a level necessary to maintain a "healthy, well-balanced population of fish and wildlife," Fla. Admin. Code Ann. r. 62-302.400(1), and the quantitative criterion that dissolved oxygen[3] concentrations average not less than 5.0 mg/L in a 24-hour period and never less than 4.0 mg/L, Fla. Admin. Code Ann. r. 62-302.530(31).

The CWA requires each state to identify, list, and prioritize segments of navigable waters within it boundaries for which CWA effluent limitations are not stringent enough to implement the state's applicable WQSs. 33 U.S.C. §§ 1313(d)(1)(A)-(B). These segments are known as "water quality limited segments" ("WQLSs"). 40 C.F.R. § 130.2(j). In 1998, the Florida Department of Environmental Protection ("FDEP") identified the lower St. Johns River as a WQLS for nutrients. (Doc. 26 p. 288.)

When a state designates a WQLS, it must develop and submit to EPA for review and approval "total maximum daily loads" ("TMDLs") of pollutants at a level

---

[3] EPA describes dissolved oxygen as "[t]he concentration of oxygen dissolved in water, expressed in mg/l ... where saturation is the maximum amount of oxygen that can theoretically be dissolved in water at a given altitude and temperature." (Doc. 30-1 p. 6 n. 5 (quotations omitted).) All parties agree that dissolved oxygen must be available to support many forms of aquatic life.

necessary to implement the state's applicable WQSs. 33 U.S.C. §§ 1313(d)(1)(C) & (2). EPA must act quickly; it has 30 days to approve or disapprove a TMDL. 33 U.S.C. § 1313(d)(2). If EPA approves a TMDL, the state must incorporate it into its current continuing planning process. Id. If EPA disapproves a TMDL, EPA has 30 days to establish a TMDL for the state. Id.

In 2004, FDEP developed a TMDL for the lower St. Johns River that focused on reducing nutrients that were being added to its water. (Doc. 33-2 ¶¶ 16-17, 37.) Working with the St. Johns River Water Management District, FDEP employed a multi-faceted model to predict water quality (measured by dissolved oxygen concentrations in the lower St. Johns River[4] and the response of chlorophyll *a* in the freshwater portion[5]) based on different combinations of abatement measures, mitigation measures, and nutrient loads. (Doc. 26 pp. 298-99; Doc. 33-2 ¶¶ 20-27.) FDEP ultimately selected a scenario that it believed best

---

[4] EPA's Protocol for Developing Nutrient TMDLs explains: "To develop a TMDL, it is necessary to have one or more quantitative measures that can be used to evaluate the relationship between pollutant sources and their impact on water quality. Such measurable quantities are termed indicators ... Dissolved oxygen concentrations are useful indicators where the primary designated use of concern is aquatic life. Dissolved oxygen concentrations already are established in state [WQSs] ... ." (Doc. 26 pp. 161, 164.)

[5] EPA's Protocol for Developing Nutrient TMDLs states: "Chlorophyll *a*, the dominant pigment in algal cells, is fairly easy to measure ... . Chlorophyll *a* is desirable as an indicator because algae are either the direct ... or indirect ... cause of most problems related to excessive nutrient enrichment." (Doc. 26 p. 165.)

met Florida's WQS narrative criterion for nutrients.  (Id. ¶ 28.)  However, this scenario employed comparisons with the Chesapeake Bay and a methodology that established dissolved oxygen concentrations of 2.3 to 4.8 mg/L.  (Id. ¶ 32; Doc. 26 p. 291.)  EPA evaluated FDEP's model and ultimately approved the resulting TMDL.  (Id. p. 268.)

EPA's approval of the TMDL is the final determination with which plaintiffs take issue.[6]  Plaintiffs assert that EPA's approval of the TMDL was arbitrary, capricious, and contrary to the CWA because the TMDL did not use Florida's WQS quantitative criterion that dissolved oxygen concentrations average not less than 5.0 mg/L in a 24-hour period and never less than 4.0 mg/L.[7]  Plaintiffs say that the extraneous criterion used by FDEP is less protective of aquatic life.  Plaintiffs ask the Court to order EPA to disapprove the TMDL, which would trigger EPA's duty under the CWA to establish a TMDL for Florida within 30 days.

Instead of responding to the merits, EPA has filed its motion for voluntary remand.  EPA admits that it approved the TMDL with the assumption that it met Florida's WQS quantitative criterion for dissolved oxygen.  EPA says that after the

---

[6]   EPA does not dispute, and courts have found, that approval of a TMDL is final agency action subject to judicial review under the APA.  See, e.g., Natural Resources Defense Council, Inc. v. Fox, 30 F.Supp.2d 369, 380 (S.D.N.Y. 1998).

[7]   Under the APA, a district court may "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... ."  5 U.S.C. § 706(2).

case was filed, it determined that the model used for the TMDL may have underestimated dissolved oxygen concentrations.  EPA asserts that remand is necessary to give further consideration to this issue and to revisit the assumptions it previously made.  The Senior Water Quality Monitor for EPA Region 4 avers that "EPA's decision on remand is not predetermined.  Depending on the results of the revised analysis, EPA might either approve or disapprove the ... TMDL." (Doc. 33-2 ¶ 44.)

Plaintiffs object to remand, arguing that the Court has everything it needs to decide the case on the merits, i.e. to determine if EPA acted arbitrarily, capriciously, or in violation of the CWA in approving the TMDL.  Plaintiffs say that EPA's remand motion "is nothing more than a stalling tactic to avoid an obvious result on the merits."  (Doc. 34 p. 2.)  Plaintiffs alternatively want the Court to remand with instructions that EPA act within 30 days and disapprove any TMDL that has a dissolved oxygen target value that will not implement Florida's WQSs and with a limitation that no new permits or increases in permitted discharge be issued until EPA approves a compliant TMDL.

## II. Discussion

In SFK USA Inc. v. United States, 254 F.3d 1022, 1027-28 (Fed. Cir. 2001), the Federal Circuit described five different positions an agency may take in response to a request for judicial review of a final determination.  Most relevant

here, the agency:

> may request a remand (without confessing error) in order to reconsider its previous position. It might argue, for example, that it wished to consider further the governing statute, or the procedures that were followed. It might simply state that it had doubts about the correctness of its decision or that decision's relationship to the agency's other policies.

Id. at 1029. The Federal Circuit explained that, when an agency takes this position, the reviewing court has discretion in deciding whether to remand. Id. (citing cases). It may grant remand if an agency's concern is "substantial and legitimate" or refuse remand "if the agency's request is frivolous or in bad faith." Id.; see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 744 (1985)("[I]f the agency has not considered all relevant factors ... the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").

The Court will use its discretion and remand the case to EPA to reconsider its previously-made decision and, if necessary, to supplement the administrative record. Cf. Natural Resources Defense Council, Inc. v. Muszynski, 268 F.3d 91, 103 (2d Cir. 2001)(remanding case to district court to remand to EPA for explanation of aspect of TMDL approval). Remand will give EPA - - the agency charged with administration of the applicable regulations - - an opportunity to consider all of the relevant information and determine whether its previous TMDL approval was correct. There is no indication that EPA's remand request is either

frivolous or in bad faith.

In the ordinary course, EPA has 30 days to approve or disapprove a state-submitted TMDL. 33 U.S.C. § 1313(d)(2). The Court finds that taking this statutory time frame into account is warranted and accordingly will remand to EPA with instructions that it act within 30 days, with the case proceeding in this Court thereafter if necessary. See Friends of Wild Swan v. U.S. Envtl. Prot. Agency, 74 Fed. Appx. 718, 722 (9th Cir. 2003)("We have previously found remand with specific instructions to be an appropriate remedy for APA violations. ... We have also previously permitted the imposition of deadlines on remand."). The Court finds that further instructions and an injunction prohibiting new permits or increases in permitted discharges would be authorized, see 5 U.S.C. § 705, but are unnecessary during this brief remand period.[8] The Court assumes that EPA will act appropriately and in good faith during the remand period.

**III.   Conclusion**

For these reasons, it is hereby **ORDERED:**

1.   Defendants Motion for Voluntary Remand (Doc. 29) is **GRANTED**. EPA shall have up to and including **October 21, 2005**, to complete its review of its previous TMDL approval and to supplement the record in this case with the results

---

[8]   The Court notes that EPA approved the TMDL at issue on April 27, 2004, yet plaintiffs did not file this case until August 18, 2004, and did not move for a temporary restraining order or preliminary injunction at that time.

of that review (and to simultaneously provide a copy to plaintiffs' counsel).

2.  A **TELEPHONE HEARING** before the undersigned to discuss case status and future proceedings is scheduled for **November 3, 2005, at 10:00 a.m.** Plaintiffs' counsel shall initiate the telephone hearing by first contacting opposing counsel then calling the Court's audio conference number at (904) 549-1949.

3.  The oral argument scheduled for September 28, 2005, is **CANCELLED.**

**DONE AND ORDERED** at Jacksonville, Florida, on September 20, 2005.

_____
TIMOTHY J. CORRIGAN
United States District Judge

p.
Copies to counsel of record